## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**WALTER CHRUBY, et al.**                                        **PLAINTIFFS**

**V.**                              **CASE NO. 5:15-CV-5136**

**GLOBAL TEL\*LINK CORPORATION**                               **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

Currently before the Court are:

- Defendant Global Tel\*Link Corporation's ("GTL") Motion to Compel Arbitration and Stay the Proceedings (Doc. 67) and Memorandum of Law in Support (Doc. 68); Plaintiffs Walter Chruby's, Earl Reese's, Stephen Orosz, Sr.'s, Stephen Orosz, Jr.'s, Michael Veon's, Stefanie Veon's, Lewis Brooks's, Jacqueline Jacobs's, and Shondra Caldwell's (collectively, "Plaintiffs") Response in Opposition (Doc. 77); GTL's Reply (Doc. 80); and Plaintiffs' Notice of Supplemental Authority (Doc. 83); and

- Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel (Doc. 63) and Memorandum of Law in Support (Doc. 65); GTL's Opposition (Doc. 73) and Statement of Facts (Doc. 74); Plaintiffs' Reply (Doc. 85); GTL's Supplemental Brief (Doc. 90); and Plaintiffs' Supplemental Brief (Doc. 92).

For the reasons given below, both Motions are **DENIED**.

## I. BACKGROUND

This case is one of four lawsuits on the topic of inmate calling services ("ICS") currently pending in this Court. Two of them are concerned with interstate calls, and two of them are concerned with intrastate calls. This is one of the intrastate cases. The Defendant in this case, GTL, is also the defendant in one of the interstate cases. A company called Securus Technologies, Inc. ("Securus") is the defendant in the other two cases.

In the instant case, Plaintiffs filed their original Complaint (Doc. 1) in this Court on June 12, 2015, followed by an Amended Complaint (Doc. 25) on August 28 of that same year. On May 17, 2016, the Court entered an Order (Doc. 46) granting in part and denying in part GTL's Motion to Dismiss (Doc. 28). Soon thereafter, venue of a related case in the Eastern District of Pennsylvania was transferred to this Court, and on July 25 of that year, this Court entered an Order consolidating that case with this one. *See* Doc. 51.

This case, like all of the ICS cases, was brought as a putative class action. As in the GTL interstate case, Plaintiffs "allege that GTL obtained exclusive contracts to provide telephone services to inmates at correctional facilities throughout the United States in exchange for the payment of kickbacks to those correctional facilities known as 'site commissions.'" *In re Global Tel*Link Corp. ICS Litig.*, 2017 WL 471571, at *1 (W.D. Ark. Feb. 3, 2017). And as in the GTL interstate case, Plaintiffs further allege "that GTL charged them excessive rates to cover the costs of site commissions it paid to correctional facilities, and charged them deposit fees that unreasonably exceeded the cost of processing deposits into prepaid accounts." *Id.*

In the GTL interstate case, the plaintiffs sought to recover these allegedly unjust rates and fees through two claims for relief—one brought under the Federal Communications Act ("FCA") through 47 U.S.C. §§ 201(b) and 206, and one brought under the common-law doctrine of unjust enrichment. *See id.* The plaintiffs in the Securus interstate case made substantially identical allegations and asserted the same two causes of action. *See Mojica v. Securus Techs., Inc.*, 2017 WL 470910, at *1 (W.D. Ark. Feb. 3, 2017). In each interstate case, the Court eventually certified one nationwide class for the FCA claims and several multi-state subclasses for the unjust enrichment claims. *See id.* at *9–*10; *In re Global Tel\*Link Corp. ICS Litig.*, 2017 WL 471571, at *10– *11 (W.D. Ark. Feb. 3, 2017).

However, in June of 2017, the Court of Appeals for the D.C. Circuit issued an opinion in a separate proceeding that this Court was concerned might be binding authority and might undermine this Court's justification for certifying the FCA classes. *See Global Tel\*Link v. FCC*, 859 F.3d 39 (D.C. Cir. 2017), *amended and superseded by Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017). Anticipating that a petition for rehearing *en banc* would be filed in that D.C. Circuit case, this Court entered administrative stays of both interstate cases pending the resolution of any such petition. The expected petition was indeed filed on July 28, 2017. It was denied only earlier this week on September 26, *see* D.C. Cir. Case No. 15-1461, Doc. 1694853, but this Court has not yet lifted the stays in the interstate cases. As for the Securus intrastate case, it was not filed until January of this year, and discovery is ongoing. No motion for class certification has yet been filed in that case.

In the instant case, Plaintiffs originally brought their claims under the FCA, the common-law doctrine of unjust enrichment, the Arkansas Deceptive Trade Practices Act ("ADTPA"), and California's Unfair Competition Law ("UCL"). However, the Court dismissed Plaintiffs' FCA claims without prejudice, essentially on the grounds that the FCA does not apply to the sort of purely intrastate communications services described in the Amended Complaint. *See* Doc. 46, pp. 5–8. The case that was subsequently consolidated with the instant one also brought claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

On February 17 of this year, Plaintiffs filed their Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel (Doc. 63). A couple of weeks later, on March 1, 2017, GTL filed its Motion to Compel Arbitration and Stay the Proceedings (Doc. 67). Both Motions have been extensively briefed, and on May 10 of this year the Court heard oral argument on them for several hours. Accordingly, both Motions are ripe for decision. Below, the Court will address GTL's arbitration Motion first. Then, the Court will take up Plaintiffs' class certification Motion.

## II. GTL'S MOTION TO COMPEL ARBITRATION (Doc. 67)

GTL has moved to compel four of the Plaintiffs to arbitrate their claims: Shondra Caldwell, Jacqueline Jacobs, Stefanie Veon, and Stephen Orosz, Sr. (collectively, "the Arbitrating Plaintiffs"). The Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon any grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has repeatedly

4

recognized this to be the enunciation of a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 566 U.S. 333, 339 (2011) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

However, the Arbitrating Plaintiffs contend that here, GTL has waived any right it may have to arbitrate their claims. "A party waives its right to arbitration if it '(1) knew of an existing right to arbitration; (2) acted inconsistently with that right; and (3) prejudiced the other party by these inconsistent acts.'" *Messina v. N. Cent. Distrib., Inc.*, 821 F.3d 1047, 1050 (8th Cir. 2016) (quoting *Lewallen v. Green Tree Servicing, LLC*, 487 F.3d 1085, 1090 (8th Cir. 2007)). The Arbitrating Plaintiffs bear the burden of demonstrating that these elements are satisfied here. *See Stifel, Nicolaus & Co. Inc. v. Freeman*, 924 F.2d 157, 158 (8th Cir. 1991). Whether these elements are met is an issue for this Court—not an arbitrator—to decide. *See N & D Fashions, Inc. v. DHJ Indus., Inc.*, 548 F.2d 722, 728 (8th Cir. 1976).

All three elements of waiver are easily satisfied with respect to Ms. Caldwell, Ms. Jacobs, and Ms. Veon. GTL contends that all three of these individuals agreed to arbitrate their claims before any of them filed their instant lawsuits, *see* Doc. 68, p. 7, so GTL surely knew of its right to arbitrate given that it possessed these arbitration agreements, *see Messina*, 821 F.3d at 1050.[1] Yet, GTL waited well over a year and a half after the instant

_____

[1] GTL insists that it did not know of its right to arbitrate until it recently received these Plaintiffs' phone numbers in discovery and used those phone numbers to identify them as the individuals who signed the arbitration agreements in question. The Court finds this implausible. GTL has been aware of these Plaintiffs' names from the moment they served it with copies of their complaints in this case, and GTL's counsel conceded during oral argument that GTL had the ability to search their database of arbitration agreements for these Plaintiffs' names. *See* Doc. 88, pp. 25–26. Given that there is no representation or evidence in the record that any such search was ever attempted, the Court places no stock in the theoretical possibility that, if such a search had been performed, it might have

litigation began before attempting to compel these Plaintiffs to arbitrate their claims. In the meantime, GTL forced these Plaintiffs to defend against a motion before the Multidistrict Litigation Panel to transfer all related actions to the Eastern District of Pennsylvania, *see* E.D. Pa. Case No. 2:15-cv-2197, Doc. 10, pp. 1, 3, and forced Ms. Jacobs and Ms. Caldwell to defend against a motion here in the Western District of Arkansas that sought dismissal of their claims on the merits, *see* W.D. Ark. Case No. 5:15-cv-5136, Doc. 28.

A party acts inconsistently with its right to arbitration "if it substantially invokes the litigation machinery before asserting its arbitration right, when, for example, it . . . fails to move to compel arbitration and stay litigation in a timely manner." *Messina*, 821 F.3d at 1050 (internal quotation marks and alterations omitted). And "[p]rejudice from a failure to assert an arbitration right occurs when, for example, parties . . . litigate substantial issues on the merits, or when compelling arbitration would require a duplication of efforts," or when a party is "forced to defend against [a] motion to transfer venue." *See id.* at 1051. The aforementioned motion to dismiss was granted with respect to Plaintiffs' claims under the FCA, and denied with respect to Plaintiffs' state-law claims—rulings which established law of the case for all of the subsequently consolidated Plaintiffs as well. Seeking "an immediate and total victory in the parties' dispute" in federal court, and then only subsequently seeking to compel arbitration smacks of "want[ing] to see how the case was going in federal district court before deciding whether it would be better off there or in

---

turned up multiple individuals with identical names. *See id.* "To safeguard its right to arbitration, a party must 'do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration.'" *Lewallen v. Green Tree Servicing, L.L.C.*, 487 F.3d 1085, 1091 (8th Cir. 2007) (quoting *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995)).

arbitration"—a form of "heads I win, tails you lose, which is the worst possible reason for failing to move for arbitration sooner than it did." *See Hooper v. Advance Am., Cash Advance Ctrs. of Missouri, Inc.*, 589 F.3d 917, 922 (8th Cir. 2009) (internal quotation marks omitted).

The issue of waiver would appear at first glance to be a bit closer with respect to Mr. Orosz, Sr. GTL contends that he signed an arbitration agreement on May 4, 2016, *see* Doc. 68, pp. 7–8, which was half a year after contested briefing was completed on the issue of venue in Mr. Orosz, Sr.'s case, *see, e.g.*, Case No. 5:16-cv-5165, Doc. 25, and one month after contested briefing was completed on GTL's motion to dismiss in the case with which Mr. Orosz, Sr.'s case was ultimately consolidated, *see, e.g.*, Case No. 5:15-cv-5136, Docs. 45, 51. After May 4, 2016, GTL did not file any contested or substantive motions until roughly ten months later, when it moved to compel arbitration. GTL represents that it has demanded minimal discovery from the Plaintiffs during that period. *See* Doc. 88, p. 30. If these facts were the whole story, then there might be a good argument that Mr. Orosz, Sr. was not prejudiced by GTL's ten-month delay. *Cf. James v. Global Tel\*Link Corp.*, 2016 WL 589676, at \*10 (D.N.J. Feb. 11, 2016) ("Here, the discovery, while not *de minimus*, does not rise to a level sufficient to constitute prejudice to the Plaintiffs.").

However, GTL knew this was a putative class action, *see* Case No. 5:16-cv-5165, Doc. 1 (styled "Class Action Complaint"), and that at some point on or before February 17, 2017—nine months after it claims he signed the arbitration agreement—Mr. Orosz, Sr. would move to certify a class and be appointed as a class representative, *see* Case No. 5:15-cv-5136, Docs. 52, 57. Yet, GTL chose not to move to compel arbitration of Mr.

Orosz, Sr.'s claims until a month after the deadline had passed for him to move for class certification, even though GTL contends that Mr. Orosz, Sr.'s arbitration agreement prohibits him from arbitrating his claims on behalf of a class. *See* Doc. 68, pp. 5–6; Doc. 68-1, ¶¶ 6, 8. By this Court's tally, the Motion for Class Certification and supporting documents that Mr. Orosz, Sr. and his fellow Plaintiffs filed on February 17, 2017 consist of 3,191 pages. *See* Docs. 63–66. Thus, if there is in fact a valid, enforceable arbitration agreement between GTL and Mr. Orosz, Sr., and if that arbitration agreement means what GTL says it means, then GTL's delay in moving for arbitration of Mr. Orosz, Sr.'s claims resulted in him devoting some substantial amount of time and effort towards the litigation of class certification issues that would be of utterly no use to him in arbitration, and that he never would have undertaken if GTL had simply moved to compel arbitration in a timely manner. That is a textbook example of prejudice.

Ultimately, then, all three elements of waiver are satisfied with respect to each of the Arbitrating Plaintiffs. Therefore, GTL's Motion to Compel Arbitration will be **DENIED**. Now the Court will turn to Plaintiffs' class certification Motion.

### III. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (Doc. 63)

Plaintiffs seek certification of the following four classes:

**Unjust Enrichment Class 1**: All persons who at any time on or after April 24, 2011, paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more intrastate phone calls from a correctional facility in Arkansas, California, Indiana, or Vermont, during a period of time when Global Tel*Link paid the facility a commission of any type in connection with the intrastate calls;

**Unjust Enrichment Class 2**: All persons who at any time on or after April 24, 2011, paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more intrastate phone calls from a correctional facility in Pennsylvania, Georgia, Florida, Maryland, Mississippi, South Dakota, or Virginia, during a period of

time when Global Tel*Link paid the facility a commission of any type in connection with the intrastate calls;

**ADTPA Class**: All persons who at any time on or after June 12, 2010: (1) paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more intrastate phone calls from a correctional facility in Arkansas, during a period of time when Global Tel*Link paid the facility a commission of any type in connection with the intrastate calls; and/or (2) paid deposit fees to Global Tel*Link in order to fund a prepaid account used to pay for any intrastate calls within Arkansas; and

**UCL Class**: All persons who at any time on or after August 28, 2011: (1) paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more intrastate phone calls from a correctional facility in California, during a period of time when Global Tel*Link paid the facility a commission of any type in connection with the intrastate calls; and/or (2) paid deposit fees to Global Tel*Link in order to fund a prepaid account used to pay for any intrastate calls within California.

*See* Doc. 63, ¶¶ 1–2; Doc. 85-1, ¶ 18; Doc. 88, pp. 69–70. Plaintiffs also initially sought certification of a UTPCPL class, *see* Doc. 63 at ¶ 2, but they have since withdrawn that particular request, *see* Doc. 85, p. 7 n.2; Doc. 85-1, ¶ 17. After reciting the legal standard for class certification motions, the Court will discuss its application to Plaintiffs' request.

## A. LEGAL STANDARD

The party seeking class certification bears the burden of proving that Rule 23's requirements are satisfied. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The district court retains "broad discretion in determining whether to certify a class, recognizing the essentially factual basis of the certification inquiry and . . . the district court's inherent power to manage and control pending litigation." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) (internal quotations and citations omitted). A district court must undertake "a rigorous analysis" to ensure that the requirements of Rule 23 are met. *Gen. Tel. Co. of the Sw. v. Falcon*, 467 U.S. 147, 161

(1982). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores*, 564 U.S. at 351 (2011). The district court may "resolve disputes going to the factual setting of the case" if necessary to the class certification analysis. *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005).

An implicit requirement for any class certification inquiry involves a court's assessment as to the *ascertainability* of the class. The description of a proposed class must be sufficiently *definite* to permit class members to be identified by objective criteria. *See Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996–97 (8th Cir. 2016). "The requirement that a class be clearly defined is designed primarily to help the trial court manage the class. It is not designed to be a particularly stringent test, but plaintiffs must at least be able to establish that the general outlines of the membership of the class are determinable at the outset of the litigation." *Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 31 (D.D.C. 2003).

Under Rule 23, certifying a class action requires a two-step analysis. *First*, the Court must determine whether:

- the class is so numerous that joinder of all members is impracticable ("*numerosity*");

- there are questions of law or fact common to the class ("*commonality*");

- the claims or defenses of the representative parties are typical of the claims or defenses of the class ("*typicality*"); and

- the representative parties will fairly and adequately protect the interests of the class ("*fair and adequate representation*").

Rule 23(a)(1)–(4). *Second*, the Court must determine whether:

- questions of law or fact common to class members predominate over questions affecting only individual members ("*predominance*"); and

- a class action is superior to other available methods for fairly and efficiently adjudicating the controversy ("*superiority*").

Rule 23(b)(3).

## B. DISCUSSION

### 1. Definition and Ascertainability

As this Court observed in its interstate GTL class certification order, "the Eighth Circuit, 'unlike most other courts of appeals, has not outlined a . . . separate, preliminary requirement' of ascertainability that would require plaintiffs to demonstrate a method of identifying class members that is administratively feasible." *In re Global Tel\*Link Corp. ICS Litig.*, 2017 WL 471571, at *3 (W.D. Ark. Feb. 3, 2017) (quoting *Sandusky Wellness*, 821 F.3d at 996). Instead,

> the Eighth Circuit simply adheres to a rigorous analysis of the Rule 23 factors, and while it recognizes that this analysis necessarily entails that a class be 'adequately defined and clearly ascertainable,' the focus of this threshold inquiry is on whether the proposed class definition identifies class members by objective criteria, rather than on the administrative concerns that are already taken into account by the Rule 23(b)(3) factors of predominance and superiority.

*Id.*

GTL argues that Plaintiffs' class definitions create choice-of-law problems by not specifying where the class members were geographically located at the time they placed an intrastate call. *See* Doc. 88, pp. 70–75. Without knowing where the class members were located, the argument goes, we cannot know which state's law to apply to any given class member's claims without conducting a choice-of-law multi-factor balancing test for

11

every single member. *See id.* But this concern, however legitimate it may be, has nothing to do with whether the proposed class definitions identify class members by objective criteria; rather, it concerns whether common issues predominate over questions affecting individual class members.

Apart from the foregoing issue, "GTL's position on ascertainability is the same in this case as in the interstate case and incorporates the same arguments and evidence here." (Doc. 73, p. 33). Likewise, for the same reasons as in the interstate case, those arguments are unavailing here and Plaintiffs' proposed class definitions satisfy the ascertainability requirement. *See In re Global Tel\*Link Corp. ICS Litig.*, 2017 WL 471571, at \*3–\*5 (W.D. Ark. Feb. 3, 2017).

### 2. Rule 23(a): Numerosity, Commonality, Typicality, and Fair and Adequate Representation

The proposed classes are numerous, likely containing at least thousands of members. Plaintiffs' claims are also typical of the proposed classes' claims, as all class members' claims "are based on the same . . . remedial theory," *Paxton v. Union Nat. Bank*, 688 F.2d 552, 561–62 (8th Cir. 1982), which is that GTL violated several states' consumer protection laws and common law of unjust enrichment "by charging them exorbitant rates and deposit fees for [intra]state phone calls." *In re Global Tel\*Link Corp. ICS Litig.*, 2017 WL 471571, at \*6 (W.D. Ark. Feb. 3, 2017). And Plaintiffs would fairly and adequately represent the classes' interests, which are aligned with their own; as in the interstate case, "they have vigorously prosecuted their own interests through qualified counsel up through the present moment in this litigation, and the Court sees no reason to believe this vigorous prosecution will abate following class certification." *Id.* GTL has not argued in its briefing that these three Rule 23(a) factors weigh against class certification,

and at oral argument counsel for GTL clarified that it has no arguments to offer with respect to these three factors that this Court has not already rejected in the interstate case. *See* Doc. 88, pp. 34–35.

Instead, GTL has focused its Rule 23(a) analysis on the factor of commonality, which it has blended with its discussion of the Rule 23(b)(3) factor of predominance. Although they implicate many of the same issues, the Court prefers to keep these two factors analytically distinct. Here, as in the interstate case:

> Plaintiffs allege that GTL recoups the site commissions it pays incarceration facilities through the rates it charges users of its inmate calling services, that GTL charges fees for depositing funds in inmate prepaid accounts that grossly exceed the cost of processing those deposits, and that these practices are the result of nationwide policies rather than of ad hoc negotiations with individual consumers of GTL's services.

*In re Global Tel*Link Corp. ICS Litig.*, 2017 WL 471571, at *5 (W.D. Ark. Feb. 3, 2017). And here, as there, these particular allegations present factual questions that are common to the class, in that their truth or falsity "do[es] not depend in any way on the individual circumstances surrounding individual payments by class members." *See id.*

### 3. Rule 23(b)(3): Predominance and Superiority

However, whether such common questions predominate over individual questions as required by Rule 23(b)(3) is a different matter. "The Rule 23(b) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The Eighth Circuit has explained that:

> When determining whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, *if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima*

*facie case for the class.* While limited in scope, this analysis should also be rigorous.

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011) (emphasis added) (internal citations and quotation marks omitted). In the interstate case, the Court was persuaded that the aforementioned common allegations, if true, could suffice to make out a prima facie case for the proposed FCA and unjust enrichment classes. However, in the instant case, the Court does not believe these same common allegations could suffice to make out a prima facie case for the proposed ADTPA and UCL classes. Furthermore, new arguments raised in this case about one of GTL's defenses to Plaintiffs' unjust enrichment claims have persuaded the Court that common issues do not predominate with respect to the unjust enrichment classes either.

GTL offers a great variety of arguments on the topic of predominance, many of which are ones that, if reached, the Court would find unpersuasive here for the same reasons it found them unpersuasive in the interstate GTL case. The Court sees no point in discussing those arguments in this Opinion, since they ultimately do not drive its decision here. Instead, the Court will focus its discussion on the new arguments GTL has offered, which have persuaded the Court that class certification is not appropriate here.

One of those arguments concerns the "voluntary payment doctrine," which GTL says it would assert as an affirmative defense in this case. This is not the first time the voluntary payment doctrine has come up in these ICS cases, but it has a particular nuance here that the Court has not previously explored. To provide some context for this new twist, the Court will first recap what the voluntary payment doctrine is, and how the issue arose in the two interstate cases.

The voluntary payment doctrine holds that "payments which are voluntarily made cannot be recovered except for payments made as a result of duress, fraud, mistake or failure of consideration." *Gautrau v. Long*, 271 Ark. 394, 396 (Ark. Ct. App. 1980). Among these ICS cases, the Court first encountered the voluntary payment doctrine in the Securus interstate case. As previously mentioned, a plaintiff in that case, Susan Mojica, was asserting claims under the FCA, as well as under the Arkansas common law of unjust enrichment, to recover excessive calling rates and excessive credit card fees (a different term for the aforementioned "deposit fees") that she had paid Securus in order to communicate with an imprisoned loved one. Before any class had been certified in that case, Securus moved for summary judgment against Ms. Mojica. For the most part, that motion was denied, but there was one issue on which it was granted—and that issue concerned the voluntary payment doctrine.

Securus contended that Ms. Mojica's "claims regarding credit card fees are barred by the common-law voluntary payment doctrine." *See Mojica v. Securus Techs., Inc.*, 2016 WL 7650654, at *4 (W.D. Ark. Nov. 29, 2016) (internal quotation marks omitted). The Court rejected this argument with respect to Ms. Mojica's claim under the FCA, ruling that "[b]ecause the voluntary payment doctrine is a creature of state common law, it does not apply to Ms. Mojica's statutory federal claim under the FCA . . . ." *See id.* (citing *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 369 (3d Cir. 2011); *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 231 (4th Cir. 2007)). However, with respect to Ms. Mojica's claim under Arkansas common law for unjust enrichment, the Court noted "the undisputed fact that [Ms. Mojica] could have obtained Securus's services while avoiding paying any credit card fees if she had used a non-credit card method of payment, such as check,

money order, or sending money to the inmate to pay from his own calling card or account," and found further that she had failed to come forward with any specific evidence that would support applying any of the traditional exceptions to the voluntary payment doctrine in her case. *See id.* at *5. Accordingly, the Court granted Securus partial summary judgment on Ms. Mojica's claim for unjust enrichment, "to the extent that this claim is for the recovery of credit card fees." *See id.*

At the time the Court made this ruling, the motion for class certification in that case had already been fully briefed and was still pending. In that class certification motion, the plaintiffs were seeking certification of one nationwide class for their FCA claims, and two subclasses for their unjust enrichment claims. Originally, all three of their proposed classes sought recovery of excessive calling rates and excessive credit card fees. But in light of the Court's summary-judgment ruling, they withdrew that portion of their class-certification request which pertained to unjust enrichment claims for credit card fees. A few months later, in its Order granting what remained of their motion for class certification, this Court addressed one of Securus's arguments on the factor of predominance as follows:

Securus argues that "individual questions arise under the voluntary payment doctrine and bar certification of any deposit fee claim." This Court has already held that the voluntary payment doctrine does not apply to Plaintiffs' FCA claims, and the argument is otherwise mooted by Plaintiffs' withdrawal of their Motion with respect to the unjust enrichment claim for deposit fees.

*Mojica v. Securus Techs., Inc.*, 2017 WL 470910, at *7 (W.D. Ark. Feb. 3, 2017) (internal alterations and citations omitted).

Meanwhile, in the GTL interstate case, although GTL had not moved for summary judgment on the issue of the voluntary payment doctrine, the plaintiffs in that case saw

the hand writing on the wall after the Court's summary-judgment ruling in *Mojica*, and accordingly withdrew their request for certification of unjust-enrichment deposit-fee subclasses in the same manner as the plaintiffs had in *Mojica*. Thus, in its Order granting what remained of those plaintiffs' motion for class certification, the Court rejected GTL's voluntary-payment predominance argument with respect to deposit fees in the same manner it had rejected Securus's—finding the argument moot as to unjust enrichment, and inapplicable to the FCA. *See In re Global Tel\*Link Corp. ICS Litig.*, 2017 WL 471571, at \*7 (W.D. Ark. Feb. 3, 2017). However, the Court addressed an additional wrinkle in GTL's argument that had been lacking in Securus's, noting that "GTL contends that the voluntary payment doctrine . . . raise[s] individualized fact issues with respect to class members' claims that recoupment of *site commissions* [through excessive calling rates] violates the common law of unjust enrichment." *See id.* at \*8 (emphasis added). The Court rejected this argument, but with the caveat that it was doing so "on the basis of the record currently before it." *See id.* It explained, "[t]here is no evidence in the record that any class members who wished to use inmate calling services had the option of *not* paying recoupments of site commissions to GTL; thus, whether these rates were 'voluntary' or the 'result of duress' under such conditions is a question that is common among all class members." *Id.* (emphasis in original).

But now, in the instant intrastate case, GTL has directed the Court's attention to concrete evidence that at least some class members who wished to use inmate calling services did, in fact, have the option of *not* paying recoupments of site commissions to GTL at least some of the time. It has provided the Court with a copy of a contract between it and a county sheriff's office, that states in relevant part: "The [inmate telephone system]

17

shall allow free local telephone calls from the booking area or to selected telephone numbers approved by [the sheriff's office]." *See* Doc. 73-15. It has identified relevant transcript portions from the deposition of one of the class representatives in the *inter*state case, Kaylan Stuart, who testified that while he was an inmate at a facility serviced by GTL, he was able to make free calls from the front of the jail to his lawyer, his grandmother, and his parents. *See* Doc. 73-21, pp. 8–14. It has also highlighted deposition testimony of Thomas Sweeney, GTL's Vice President of Sales and Marketing, likewise taken through the *inter*state case, describing how inmates "have free calls at all the booking phones." *See* Doc. 73-4, p. 14.[2]

In addition to this evidence regarding free calling options, GTL has given the Court a related set of arguments to ponder that was not raised in either of the interstate cases. This family of arguments crops up in various guises throughout GTL's Response— sometimes as an argument about predominance, and at other times as an argument about whether Plaintiffs have standing. But essentially, this family of arguments boils

---

[2] Out of curiosity, the Court went back to the docket for the interstate GTL case, to explore whether these particular deposition transcripts ever made it into the evidentiary record. Interestingly enough, they did—but courtesy of the *plaintiffs*, rather than GTL. As best the Court can tell, GTL never attached any deposition testimony of Mr. Sweeney to its class certification and summary judgment briefing in that case. And although GTL did attach some other excerpts (on other topics) from Mr. Stuart's deposition, it never attached *these* particular excerpts. *See In re Global Tel\*Link Corp. ICS Litig.*, Case No. 5:14-cv-5275, Doc. 106-8. However, among the plaintiffs' many exhibits in support of *their* class certification briefing, were the *entire* deposition transcripts for both Mr. Sweeney and Mr. Stuart—including the pages discussed above. *See In re Global Tel\*Link Corp. ICS Litig.*, Case No. 5:14-cv-5275, Doc. 93-4, pp. 171, 1063–67, 1083– 84. So actually, when the Court wrote in its class certification order in that case that "[t]here is no evidence in the record that any class members who wished to use inmate calling services had the option of *not* paying recoupments of site commissions to GTL," it was incorrect. What it should have written was that no such evidence had been brought to the Court's attention. But it is there, and now the Court is aware of it.

down to the following proposition: that GTL has not harmed anyone by simply offering a service, at a fully and honestly disclosed price, to inmates who are perfectly free to take or leave the offer as they wish, and then providing exactly what was promised to those who choose to accept the offer.

To the extent this is an argument that Plaintiffs lack standing to bring their claims, the Court does not buy it. Plaintiffs allege, *inter alia*, that GTL exploited an exclusive-provider contract by charging them, and all proposed class members, excessive phone rates that were designed to recoup the exorbitant site commissions GTL paid to acquire the exclusive contracts in the first place. The Court simply does not see how it could rule that this sort of allegation fails to describe a "concrete and particularized" injury that is "an invasion of a legally protected interest," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), given that, for example, the Arkansas Supreme Court has affirmed a finding that an entity violated the ADTPA by improperly exploiting economic leverage resulting from exclusive-provider contracts. *See Baptist Health v. Murphy*, 365 Ark. 115, 128–29 (2006).

But to the extent this is an argument not about standing, but about the voluntary payment doctrine, the Court finds it much more persuasive, because it is a defense that GTL could assert against *every single member* of the proposed unjust enrichment classes.[3] True, Plaintiffs would then turn around and argue that one of the exceptions of "fraud, duress, mistake of fact, coercion, or extortion" applied, *see Douglas v. Adams Trucking Co., Inc.*, 345 Ark. 203, 212 (2001), but that would be an inherently individualized inquiry.

---

[3] Importantly, the voluntary payment doctrine exists in every member state of the proposed unjust enrichment classes. *See* Doc. 73-33, pp. 3–5 (collecting authorities).

For example, consider an unpopular inmate housed in a maximum-security facility 500 miles away from his nearest loved one, with no free-calling options. And then consider a popular inmate at a minimum-security facility with free-calling options, whose loved ones routinely visit him in person but every once in a blue moon chat with him on the phone instead. The case for duress is obviously much easier to make for the former than the latter. Or, instead of conversations between longed-for loved ones, consider conversations between inmates and investigative journalists,[4] or between inmates and psychology students who are researching cognitive distortions common to criminal thinking. Can the decision to pay for either of those types of phone calls be fairly characterized as having been made under duress? At a minimum, the Court is very skeptical that they could be.

The Court's point in providing these hypothetical examples is not to suggest that any of them is typical of the proposed class members, or to speculate about the percentage of class members against whom GTL's voluntary payment defense would actually succeed. Rather, the Court's point is simply that GTL's voluntary payment defense can be asserted in good faith against every member of the proposed unjust enrichment classes, and that it cannot be resolved without an individualized inquiry every time—not only into each member's personal circumstances, but even into the particular circumstances surrounding *each call*. The Court is certainly mindful of the Supreme Court's instruction that "[w]hen one or more of the central issues in the action are common

---

[4] Listeners to the first season of the popular podcast "Serial" might recall the recorded message that opened every episode of that season (and every phone conversation between the show's host and the show's subject): "This is a Global Tel*Link prepaid call from Adnan Syed, an inmate at a Maryland correctional facility." *See* https://www.youtube.com/watch?v=cGD2H5Fg2Dc (last visited September 25, 2017).

to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotation marks omitted). But that is a far cry from the situation here. GTL's voluntary payment defense overwhelms issues common to the unjust enrichment classes. It plays every bit as ubiquitous a formal role in the determination of liability as is played by the very elements of the offense, and is countless times more labor-intensive.

It is illuminating to contrast this particular defense of GTL's with a different one, which the Court does *not* believe would frustrate predominance: arbitration. GTL has standard form arbitration agreements, provided to users of ICS in the form of automated telephone messages or internet-browser check-the-box text. The Court has already found the telephonic arbitration agreement unenforceable in GTL's interstate case, for reasons that would almost certainly apply with equal force to every single class member against which GTL would assert that defense in this case. *See In re Global Tel\*Link Corp. ICS Litig.*, 2017 WL 8311101 (W.D. Ark. Mar. 2, 2017). And assuming for the sake of argument that the Court were to find the online arbitration agreement enforceable (other than against the Arbitrating Plaintiffs discussed in Section II of this Order), identifying class members against whom it should be enforced would require nothing more than a very simple search for names in an electronic database. *See* pp. 5–6 n.1, *supra*; Doc. 88, pp 25–26. That is very different from the administrative nightmare created by GTL's voluntary payment defense, which is effectively a separate full-on trial on the merits with respect to every single member of the unjust enrichment classes.

As for Plaintiffs' proposed statutory classes, the Court doubts that the voluntary payment doctrine is available to GTL against any of their members. The Court has been unable to find a single California case discussing the availability of the voluntary payment doctrine as a defense against UCL claims, or a single Arkansas case discussing its availability against ADTPA claims. Consumer protection statutes are intended to be construed broadly in favor of the consumer, such that applying a common-law defense to a consumer's claim may stymie the legislative intent. *See Sobel v. Hertz Corp.*, 698 F. Supp. 2d 1218, 1223–24 (D. Nev. 2010) (collecting cases discussing whether the voluntary payment rule may be properly asserted as a defense to a statutory consumer protection claim). Several courts have found that public policy does not favor allowing a voluntary payment defense to a statutory claim. *See Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 231 (4th Cir. 2007) (explaining that "common law immunities cannot trump the [Fair Debt Collection Practices] Act's clear application"); *Sobel*, 698 F. Supp. 2d at 1224 (finding that Nevada's Deceptive Trade Practices Act was designed "primarily for the protection of consumers" and that permitting the voluntary payment rule to be asserted as a an affirmative defense would be contrary to public policy); *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wash. 2d 59, 86 (2007) (finding the voluntary payment rule "inappropriate as an affirmative defense in the [Washington Consumer Protection Act] context" because the Act should be construed "liberally in favor of plaintiffs"); *Huch v. Charter Commc'ns, Inc.*, 290 S.W.3d 721, 727 (Mo. 2009) ("To allow [defendant] to avoid liability [under Missouri's Merchandising Practices Act] for this unfair practice through the voluntary payment doctrine would nullify the protections of the act and be contrary to the intent of the legislature."); *Ramirez v. Smart Corp.*, 371 Ill. App. 3d

22

797, 804 (Ill. Ct. App. 2007) (holding that Illinois "has an interest in transactions that violate 'statutorily-defined public policy'" such that "the voluntary payment rule will not be applicable").

However, the problems with predominance that characterize the voluntary payment defense nevertheless also characterize Plaintiffs' classwide prima facie cases under the ADTPA and the UCL. This is because these causes of action all require a plaintiff to prove more than simply that GTL had a uniform practice of recouping site commissions (and charging excessive deposit fees), and that the plaintiff or class member paid GTL a calling rate (or deposit fee). They also require a plaintiff to prove things that require inherently individualized inquiries, along similar lines to what has been discussed above with respect to the voluntary payment doctrine.

For example, take Ark. Code Ann. § 4-88-107(a)(8), which is one of the two prongs of the ADTPA under which Plaintiffs bring their claims. That section requires that the claimant be "reasonably unable to protect his or her interest because of: (A) Physical infirmity; (B) Ignorance; (C) Illiteracy; (D) Inability to understand the language of the agreement; or (E) A similar factor." *Id.* Factors (A) through (D) obviously all require individualized inquiry, and just as obviously, none of those first four factors would be common among all class members. Plaintiffs could try to argue that incarceration is a "similar factor" under (E)—but then what about our hypothetical inmate who receives regular visits from loved ones and feels no urgent need to call them on the phone as well, but nevertheless does so on rare occasions just because he finds it pleasant to do so every now and then? What about an inmate who has free calling options but chooses for whatever reason not to use them? What about our hypothetical investigative journalist or

psychology student? For that matter, what about literally any member of the class who is not an inmate and not an inmate's loved one, but who simply wishes to speak over the phone with an inmate on any topic at all that is not urgent and is willing to pay to do so? It seems impossible to the Court that a prima facie showing of liability under (E) could be made with respect to any such class member without delving into an individualized inquiry.

The same problem is present under Plaintiffs' other ADTPA prong, Ark. Code Ann. § 4-88-107(a)(10), which prohibits "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or ~~trade~~." Plaintiffs are not alleging that GTL has been lying to them, so presumably they intend to prove that GTL unconscionably exploited its economic leverage by charging them excessive rates and fees. *See, e.g.*, *Universal Cooperatives, Inc. v. AAC Flying Serv., Inc.*, 710 F.3d 790, 795–96 (8th Cir. 2013). But when examining whether a contract is unconscionable under the ADTPA, "the courts should review the totality of the circumstances surrounding the negotiation and execution of the contract." *State ex rel. Bryant v. R & A Inv. Co., Inc.*, 336 Ark. 289, 296 (1999) (quoting *Ark. Nat'l Life Ins. Co. v. Durbin*, 3 Ark. App. 170, 174–75 (1981)). And there we are right back in individualized-inquiry land.

As for the UCL, pursuant to this Court's Order last year on GTL's Motion to Dismiss, although there are three ways of establishing liability under that statute, only one is available to Plaintiffs here: the so-called "unfairness" prong. *See* Doc. 46, pp. 17–18. And as the Court observed in that same Order:

> In cases where the plaintiff is a consumer alleging violation of the UCL's unfairness prong, the California Supreme Court "has not established a definitive test to determine whether a business practice is unfair." *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 256 (2010). In that

absence, a split of authority has arisen amongst the California Courts of Appeal, producing at least three different tests. *Id.* Plaintiffs argue they have alleged sufficient facts to support a claim under two of these tests, known respectively as the "balancing test" and the "public policy test." To state a claim under the balancing test, the alleged business practice must be "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," and "the gravity of the harm to the alleged victim" must outweigh "the utility of the defendant's conduct." *See id.* at 257 (quoting *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1260 (2006)). To state a claim under the public policy test, the alleged business practice must violate some public policy that is "tethered to specific constitutional, statutory, or regulatory provisions." *See id.* (quoting *Bardin*, 136 Cal. App. 4th at 1260–61). A third test, which the parties have not argued, draws guidance from the notion of unfairness expressed in the Federal Trade Commission Act at 15 U.S.C. § 45(n), and requires the consumer to have suffered an injury that is (1) "substantial," (2) not "outweighed by any countervailing benefits to consumers or competition," and (3) one "that consumers themselves could not reasonably have avoided." *See id.* (quoting *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 597–98 (2009)).

(Doc. 46, pp. 18–19).

The "balancing" test is the only test the Plaintiffs mention in their class certification briefing. But once again, it explicitly demands an individualized analysis by requiring the Court to *weigh* the "gravity of the harm to the alleged victim"—which, as described above, will vary dramatically from one victim to another—against the "utility of the defendant's conduct." As for the "public policy" test, Plaintiffs have put forward no theory of the case under it, and the Court is unaware of any "specific constitutional, statutory, or regulatory provision" on which they could rely for their claims. So the Court does not see how it could certify a class under that test. And the third test, which Plaintiffs also have not discussed, requires at least *two* elements of individualized analysis: whether the claimant's harm is "substantial," and whether the claimant could "reasonably have avoided it." As to the latter of those two, this would again turn on peculiar facts like the availability of free-calling options, the ease and frequency with which their loved ones

could visit them in person, and the urgency of the need or desire for the particular phone calls themselves.

There simply is no path forward under the common law of unjust enrichment or the statutory laws of ADTPA and the UCL that avoids the necessity of overwhelmingly claimant-specific factual analysis. Therefore, the Court cannot certify these classes. Given that conclusion, there is no need to address the final Rule 23(b)(3) factor of superiority.

Some final comments are warranted. Throughout these four ICS cases, the Court has endeavored to keep its rulings as consistent from one case to another as the facts and law of each case permits. But the Court must acknowledge a certain inconsistency in outcome between its decisions to certify unjust enrichment classes in the interstate cases (particularly the GTL one) and its decision *not* to certify unjust enrichment classes in the instant case. The Court would make three observations on this point.

First, GTL presented the Court this time with arguments that had not previously been made to it, and which had not previously occurred to the Court. The Court finds those new arguments persuasive where the old ones were not, and it believes it has a duty to rule in accordance with what it presently understands the law to require here.

Second, the inconsistency will not be permanent. "The court's duty to assure compliance with Rule 23(a) continues even after certification," *Hervey v. City of Little Rock*, 787 F.2d 1223, 1227 (8th Cir. 1986), and "[a]n order that grants or denies class certification may be altered or amended before final judgment," Fed. R. Civ. P. 23(c)(1)(C). As previously mentioned, both interstate cases are presently stayed, but the event which prompted the stays appears to have recently been resolved. *See supra*, p.

3. After those stays are lifted, the Court will take whatever measures are appropriate at that time to restore consistency to its rulings in these ICS cases.

Third, at least for now, the Court considers the D.C. Circuit's opinion in *Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017), to be much more relevant to the issue of FCA class certification in the interstate cases than the instant Opinion and Order is. As previously noted, the Court does not believe the defense of voluntary payment is available against claims brought under the FCA. And the Court's analysis of the ADTPA and UCL proposed classes was grounded in the elements of those particular causes of action— not in the elements of any cause of action under the FCA.

Of course, the instant case is not either of those interstate cases. But the Court makes these observations here out of courtesy to the parties and in the interest of judicial economy, knowing that counsel for GTL, Securus, and the plaintiffs in all four ICS cases all read all of the opinions and orders that this Court files in all four cases. Beyond these closing bare observations, the Court will not speculate any further here on this Order's implications for the interstate cases.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Global Tel\*Link Corporation's Motion to Compel Arbitration and Stay the Proceedings (Doc. 67), and Plaintiffs Walter Chruby's, Earl Reese's, Stephen Orosz, Sr.'s, Stephen Orosz, Jr.'s, Michael Veon's, Stefanie Veon's, Lewis Brooks's, Jacqueline Jacobs's, and Shondra Caldwell's Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel (Doc. 63) are both **DENIED**.

**IT IS SO ORDERED** on this _28th_ day of September, 2017.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE